## THE TUXEDO.
### No. 13871.

District Court, E. D. New York.
June 29, 1934.

John E. Morrissey, of New York City, for libelant.

Lynch & Hagen, of New York City (Charles W. Hagen and Henry C. Eidenbach, both of New York City, of counsel), for claimant.

BYERS, District Judge.

On February 8, 1928, at about 9:13 p. m., the Erie ferryboat Tuxedo was in collision with the Lackawanna ferryboat Binghamton about off D. L. & W. Pier 5, Hoboken, at from 400 to 500 feet from the pier end under

conditions of dense fog. The visibility was from 75 to 100 feet.

The Tuxedo was bound from her 23rd street pier on the New York side, to the Erie Terminal at the foot of Pavonia avenue, Jersey City, and the Binghamton had left the D. L. & W. Terminal on her 9:10 trip for Barclay street, New York, so that the vessels were headed on converging courses.

As to both there is no issue concerning lights, lookouts or fog signals, conformity to all such requirements having been shown.

The libellant's cause is based upon the allegation that the Tuxedo was proceeding at an immoderate speed and the controversy turns upon that single question.

The Tuxedo had left her slip at 8:59 o'clock, and had therefore consumed 14 minutes in arriving at the place of collision, having covered about 1½ miles in that time, against a flood tide. This was at a speed of better than 5½ miles an hour, for the entire distance, but that does not establish her rate of progress at the time of collision, for she had stopped her engines twice before that happened, once to permit a crossing ahead by the Maplewood bound from Christopher street to the D. L. & W. piers; that was at about 9:11, as nearly as it can be stated.

The Tuxedo then went ahead at slow speed until she heard a fog signal ahead, when she again stopped her engines and promptly passed starboard to starboard the D. L. & W. Ithaca, bound from Barclay street to her Hoboken slip. The latter heard the Tuxedo, but did not see her, and fixes that time at about 9:12. It is impossible to state that precisely because the Ithaca did not dock promptly, by reason of the Maplewood's missing her slip, which caused the Ithaca to hold off, and reverse her engines, whereby she did not make fast until 9:19.

These circumstances are alluded to as indicating the difficulty of navigation under the fog conditions that prevailed. Also because the important question is the speed at which the Tuxedo traveled after her second engine stop until reaching the place of collision, rather than her prior speed down the river.

As to the latter question, her testimony is not contradicted, that in the vicinity of 23rd street the fog was not so dense as it was lower down, because the lights on the Jersey shore were visible as a glow or blur when the Tuxedo made out from her New York pier. Under such conditions her speed would not need to be as much restricted, as would be the case lower down the river.

Reverting to the first stop of the Tuxedo's engines, her captain and other witnesses said it was to permit the D. L. & W. 23rd street boat, which left at 9 o'clock and followed the Tuxedo down, to cross ahead and go into the slip, but that could not have been the fact, as the former docked at 9:16, which was after the collision. However, the Maplewood did cross ahead of the Tuxedo as has been stated, and with visibility so restricted, the Tuxedo's testimony is not discredited because of what is thought to have been a mistake in identity of the crossing vessel.

The second stop is consistent with Berton's testimony; he was captain of the Ithaca, and passed to port of the Binghamton coming out of the D. L. & W. Terminal, when the Ithaca was off Pier 2. At that time he heard an Erie vessel's fog signal about 3 points off his starboard bow, which vessel he did not see. Her signal was not heard as distinctly as that of the Binghamton, but the witness did not indicate that the difference was marked. He heard the Binghamton's signal about 2 points off his port bow.

It is possible to infer that the Tuxedo and Binghamton were about equidistant from the Ithaca when the latter heard their respective fog signals. That would mean that each traveled about the same distance as the other before they came in contact. This is an approximation at best, but is the only orientation that can be based on neutral testimony. If it is sound, then there was no great variation between the speeds of the colliding vessels immediately prior to the contact, meaning that it does not lie with the Binghamton to criticize the speed of the Tuxedo.

Another method of approach is to consider the report made to the local inspectors by the navigator of the Binghamton the second day following the accident; following a reference to his heading downstream (this was at least 400 feet out from his slip as the testimony shows) and passing the Ithaca port to port, the language is: "Fog signals were then heard off the port bow of the Binghamton and the Binghamton's engines were again stopped, and immediately thereafter the ferryboat Tuxedo loomed out of the fog headed for the port side of the Binghamton * * *."

This was more nearly contemporary with the event than the testimony given six years later, that the Tuxedo was first heard from abaft the beam of the Binghamton, and is therefore preferred.

Since the Binghamton was headed downstream when she first heard the Tuxedo, and

had just passed clear of the Ithaca, and since the latter passed the Tuxedo starboard to starboard, being bound upstream, the Tuxedo was inclining more to a down-river than a cross-river course, because there was only one minute's interval approximately after the Ithaca cleared both vessels, before the collision. This means that if either vessel was moving faster than the other, it was the Binghamton. Each became aware of the other at a distance of 75 feet or less, sounded an alarm, stopped and reversed, but too late to avoid contact.

The starboard bow of the Tuxedo struck the port side of the Binghamton forward; the nature and extent of the damage to the latter was explained by a surveyor as being to the hull, first, and later to the housing, i. e., from forward to aft. The guard of the Tuxedo went under the guard of the Binghamton.

As to the Tuxedo this witness said, "Yes, the damage on the Tuxedo, what was torn and broken off, were pushed forward instead of backward," namely, from aft to forward.

■ It is almost as difficult to discover the true relation of these vessels to each other, from a consideration of the evidence, as it was for them to navigate in a dense fog, with mutual caution, on the night of the collision, because the testimony of each set of witnesses is naturally in behalf of their own craft. The fact remains that the burden of proof rested upon the libellant, and that the libel was not filed until 5 years, 5 months and 21 days after the collision. The latter incident does not prove lack of fault on the part of the Tuxedo, but it clearly reveals a protracted reticence in the Binghamton's undertaking to prove it.

■ Under the circumstances no finding will be made concerning the precise speed of the Tuxedo prior to the striking, but the court is persuaded that she was not making more than slow speed, after having stopped her engines for the Ithaca to pass to starboard, and that whatever her speed was, it was at least no greater than that of the Binghamton, and that precisely the same restrictions in that respect governed both vessels.

Neither vessel was ahead of the other when they came mutually into sight; they were on converging courses, without knowing it, and as they gradually neared each other, the Binghamton's signals were first heard abaft the beam to starboard on the Tuxedo; the latter heard them gradually getting louder, but the Binghamton was never ahead of the Tuxedo until the moment of contact; it was when the Binghamton's fog signal was heard forward of her beam that the Tuxedo, in obedience to article 16 of the Inland Rules (33 USCA § 192), stopped her engines and reversed.

The libel will be dismissed with costs, for failure of proof.

Settle decree, and findings if desired, on notice.